IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ASHLEY FARRINGER,<br><br>    Plaintiff,<br><br>vs.<br><br>CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration,<br><br>    Defendant. | 4:12-CV-3103<br><br>MEMORANDUM AND ORDER |

  This matter is before the Court on the denial, initially and upon reconsideration, of plaintiff Ashley Farringer's disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. The Court has considered the parties' filings and the administrative record, and reverses the Commissioner's decision to deny benefits. The Court will remand this case to the Commissioner for calculation and award of benefits.

## PROCEDURAL HISTORY

  Farringer applied for disability insurance benefits in January 2011, alleging disability beginning on August 25, 2010. T134-35. Farringer's claims were denied initially and on reconsideration. T71-74, 79-82. Following a hearing, the administrative law judge (ALJ) found that Farringer was not disabled as defined under 42 U.S.C. §§ 416(i) or 423(d), and therefore not entitled to disability benefits. The ALJ determined that although Farringer suffered from several severe impairments, and could no longer perform her past relevant work, she had the residual functional capacity to perform other jobs that exist in significant numbers in the national economy. T6-21. The Appeals Council denied Farringer's request for review of the decision. T1-4. Farringer's complaint seeks review of the ALJ's decision as the final decision of the Commissioner under sentence four of 42 U.S.C. § 405(g). Filing 1.

## FACTUAL BACKGROUND

  Farringer suffers from a number of diagnosed physical and mental conditions. The record contains extensive evidence of Farringer's medical treatment and evaluation; that record has been fully reviewed, but only the particularly relevant portions will be summarized below.

MEDICAL HISTORY

Farringer has, at various times, been in the Naval Reserve and served on active duty in Kuwait and Iraq. T316. She was involved in conflicts with other soldiers and her superiors, the details of which are unnecessary to the Court's disposition of this case. *See* T316-18.

Farringer was seen for a psychiatric consultation at the Lincoln, Nebraska Department of Veterans Affairs (VA) hospital on November 12, 2009. T316. Her psychiatrist, Ahsan Naseem, M.D., diagnosed her with an anxiety disorder. T316. On May 18, 2010, Naseem changed that diagnosis to posttraumatic stress disorder (PTSD). T316. At a mental health consultation in July 2010 with VA staff psychiatrist Dr. Mary Jo Hanigan, Farringer reported moderate to severe symptoms of PTSD. T317. She expressed feelings of depression and anxiety, and reported social isolation and distrust. T317. She said she had service-related nightmares two to three times per week. T317. Farringer also said she had been following up with Naseem, although notes from that treatment are not in the record before the Court.[1] T318.

Farringer told Hanigan she frequently had to call in sick to her job as a customer service representative, or had to work "'in the back of the store'" because of anxiety or paranoia. T318. Hanigan noted that while Farringer had "been able to attain and maintain gainful employment at this point . . . as her symptoms persist she is in jeopardy of compromising her occupational function because of the irritability, the paranoia and the pronounced anxiety." T319. Hanigan's preliminary diagnosis was also PTSD. T319.

In a letter to the Nebraska Veteran Service Office dated September 13, 2010, Naseem opined that it was "unlikely that [Farringer] could sustain fulltime employment at this time" and that it was at least as "likely as not that she will continue to remain permanently and totally disabled." T604. Naseem explained that Farringer exhibited

> severe continuing PTSD symptoms that impose on her daily life activities. She suffers occupational and social impairment with deficiencies in most areas such as work, judgment, thinking and mood. She experiences near-continuous panic and depression that affects her ability to function independently, appropriately, and effectively. She has difficulty adapting to stressful situations which, on occasion, creates episodes of unprovoked irritability

---

[1] The record reflects a number of VA medical appointments that occurred, but for which no treatment notes are available. T293-306, T26-27. The Court notes the existence of these appointments solely to the extent that Naseem's familiarity with Farringer reflects on his credibility as her treating psychiatrist.

and periods of violence. Her isolative and withdrawn behavior has affected her ability to establish and maintain effective relationships, which created a severe hardship in conducting her professional responsibilities.

T604. Naseem concluded that Farringer's symptoms were "chronic and her condition is not expected to change due to her psychological state." T604.

Farringer saw Naseem again at a scheduled appointment on January 5, 2011. T380. Naseem noted increased stress due to gastrointestinal illness. T380. Farringer saw Amber L. Kutayli, Ph.D., at the VA hospital on January 7 for individual psychotherapy, and reported increased depression and anxiety, exacerbated by her physical illness. T379. On January 11, Naseem saw Farringer again, assessed her condition as chronic PTSD, and prescribed medications and continued individual therapy with Kutayli. T373-74. The next day, a VA staff physician diagnosed Farringer with gastroesophageal reflux disease, and a chronic cough that was probably secondary to the reflux disease. T376. Farringer continued to see Kutayli, whose treatment notes generally reflect ongoing stress, anxiety, and depression, although some weeks were better than others. T371, T369, T339, T326, T562, T559-60.

In March 2011, Farringer was also diagnosed with fibromyalgia. T321-22. She also completed two questionnaires at the request of the state disability examiner, answering a series of detailed questions about her daily activities. T150-51. Farringer reported that she started a typical day with a "few hours getting ready"; she explained that her medications made her groggy so it took her some time to get moving. T153. Her household chores included taking care of pets and other tasks split with her roommate, such as 30 minutes doing dishes, 20 minutes of sweeping, and laundry only if her roommate couldn't do it, because the washer and dryer were upstairs. T153. She said she had a hard time coming down stairs. T154. She said that she sometimes went a few days without a shower or a "real meal" if she was depressed or her stomach was bothering her. T153. For food, she could make simple things like canned goods, a sandwich, or cereal. T153.

Farringer said she could drive a car, but for no more than 90 minutes because of anxiety and body aches. T153. Her errands were limited to a couple of doctor's appointments a week, a weekly trip to the grocery store, and miscellaneous unplanned errands. T154. Her hobbies were several hours of painting, coloring, and writing and research a week, and a couple of hours of television per day. T154. She also volunteered at a local cat shelter on Saturday mornings and sometimes visited friends and family, although that was limited by anxiety. T154. She said she had to give up working because

she suffered panic attacks working with the public and because it required her to stand up to 10 hours a day. T156.

Farringer reported sleeping about 9 hours a night, but not straight through because of nightmares. T154. She could only walk for about 30 minutes at a time without having to stop due to pain. T154. But sitting also got uncomfortable after about 90 minutes. T154. Farringer described her symptoms as including anxiety, depression, joint disease, migraines, chronic cough, and reflux disease. T155. She said that she felt tired and worn down most of the day. T155.

Farringer was seen for a consultative physical examination on May 27, 2011, by Paul Kolkman, M.D. T434. Kolkman's "impressions" were that Farringer had possible fibromyalgia and likely PTSD with anxiety. T439. Farringer's physical residual functional capacity (RFC) was assessed by Jerry Reed, M.D. and Arthur Weaver, D.O., who found some limitations imposed by possible fibromyalgia. T443-50, T590-98. Specifically, in September 2011, Weaver found that Farringer could occasionally lift up to 20 lbs., frequently lift only up to 10 lbs., and could sit or stand with normal breaks for about 6 hours in an 8-hour workday. T591. And Weaver opined that Farringer should avoid even moderate exposure to extreme cold. T594.

Farringer continued to see Kutayli and Naseem for mental health treatment, and the symptoms reflected in their notes remained largely the same. T559-62, T549-54, T660, T650, T627, T619. Farringer's mental RFC was assessed by Lee Branham, Ph.D. in September 2011, who found Farringer to have moderate limitations in her ability to work in coordination with or proximity to others without distraction, interact appropriately with the general public, and accept instructions and respond appropriately to criticism from supervisors. T570-71. Branham found no other significant limitations. T570-71. Branham found that Farringer was mildly limited in her activities of daily living and maintaining concentration, persistence, or pace; and moderately limited in maintaining social functioning. T585.

On December 5, 2011, Naseem, as Farringer's treating psychiatrist, completed a mental impairment questionnaire. T672. Naseem identified Farringer's symptoms as including appetite disturbance, sleep disturbance, mood disturbance, emotional lability, social isolation or withdrawal, decreased energy, psychomotor agitation or retardation, feelings of guilt or worthlessness, difficulty thinking or concentrating, and intrusive recollections of a traumatic experience. T666-67. He opined that Farringer's psychiatric condition exacerbated her experience of physical symptoms, because PTSD can induce restlessness, insomnia, and fatigue, which can in turn exacerbate chronic pain. T668.

Naseem opined that Farringer's impairments would cause her to be absent from work more than three times a month (which was the maximum answer available on the questionnaire). T669. Naseem also opined that Farringer had a good or unlimited ability to understand and remember short and simple instructions and carry them out, sustain an ordinary routine without special supervision, make simple work-related decisions, ask simple questions and request assistance, and be aware of normal hazards and take appropriate precautions. T669-70. But Farringer had only a fair ability to get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes. T670. And Farringer had *no useful ability* to remember work-like procedures, maintain attention for a 2-hour segment, maintain regular attendance and be punctual within customary (usually strict) tolerances, work in coordination with or proximity to others without being unduly distracted, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in a routine work setting, or deal with normal work stress. T669-70. Naseem explained that Farringer had cognitive limitations, remained severely socially avoidant, was guarded in the proximity of others, and experienced severe symptoms when challenged. T670.

Naseem further opined that while Farringer had a fair ability to set realistic goals or make plans independently of others, Farringer had no useful ability to understand and remember detailed instructions or carry them out, or deal with the stress of semiskilled and skilled work. T671. Naseem explained that Farringer had experienced severe setbacks when exposed to even limited stress. T671. She could not function well in unfamiliar surroundings. T671. Her gastrointestinal symptoms would also create a severe compromise, and exposure to loud sounds would trigger a severe startle reaction. T671. Farringer was, according to Naseem, moderately limited in her activities of daily living and maintaining social functioning; markedly limited in maintaining concentration, persistence or pace; and had four or more episodes of decompensation of extended duration.[2] T671-72.

---

[2] Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00C. The term "[r]epeated episodes of decompensation, each of extended duration" means at least three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks. *Id.*

HEARING TESTIMONY

Farringer's testimony at the hearing before the ALJ was generally consistent with her responses to the earlier disability questionnaires. Asked to describe a typical day, Farringer said she woke up

> anywhere from seven to noon, seven in the morning to noon, and I will eat breakfast and take my medication. I usually do some household chores, light household chores. I'll watch a little television and then maybe go run some light errands. I don't ever go anywhere alone. I'll probably take a nap in the afternoon. Most days I do that because I don't get enough sleep at night. I usually switch positions throughout the day, whether I'm standing, lying down or sitting because I can't usually find a comfortable position. I'll eat dinner around six-ish. My appetite's there and then I'll try to go to, I'll watch a little T.V. after that, maybe read a book, try to go to bed around 9:30 then I'll wake up every couple of hours.

T35-36. Farringer said her roommate primarily made meals and performed most household chores, although Farringer sometimes loaded the dishwasher, swept the floors, and paid bills. T36. Farringer's roommate did most of the grocery shopping. T37. Farringer said that she could drive to the gas station but did not pump the gas. T37. When asked where she went when she left the house, Farringer replied,

> I will go to like my doctor's appointments or to pick up like little things from the grocery store, like a donut in the morning maybe, if I'm hungry. I'll go get like, Christmas presents but I like to go usually when it's not busy, early in the morning or late at night.

T37. She went to Wal-Mart for Christmas presents. T37. But most of her shopping was done online. T37. She said that she didn't have many friends anymore, so social occasions were mainly limited to "a major family event or something like that." T37. She saw her family on "[b]ig family holidays and maybe once or twice a month." T38. She had a few friends that might come by and visit once or twice a week "in a good month." T38.

Farringer said that she sometimes left home with her roommate, to "go to a movie or something like that," but not frequently. T38-39. They didn't eat out, usually getting takeout food, in part because Farringer wanted to avoid meeting anyone she knew. T39, T46. Farringer estimated that she watched about 3 hours of television a day and spent about 3 hours a day on the

computer. T39. She estimated about an hour a day reading, but could only read for about 30 minutes before losing concentration. T39-40. She said she got a total of 4 to 5 hours of sleep in an average night, and did not feel well rested in the morning. T47. Her medications also caused drowsiness. T48. She napped once or twice a day, for a total of 2 to 3½ hours. T47-48.

Farringer said she could take care of herself with some help, but that some things were difficult or painful for her because it was hard for her to bend over. T40-41. Farringer also cared for the household's two dogs and three cats; she could take the dogs for a walk on a good day. T43. Her exercise was otherwise limited to chores and 30 minutes a day of stretching exercises suggested by her physical therapist. T43.

Farringer testified that her social interaction was limited by her mental condition, and that she isolated herself. T45. She had trouble managing anger with other people. T48-49. She was paranoid about being watched, particularly by the government. T45. Being in public or large groups of people caused pronounced anxiety. T46. At her last job, in retail customer service, Farringer had constant anxiety problems where she would need to isolate herself from customers. T44. She had trouble with authority figures. T45. Her nightmares included dreams about one figure in particular. T47.

The vocational expert (VE) who testified at the hearing was presented with a hypothetical assuming a claimant who was limited to light work and should avoid even moderate exposure to extreme temperatures, and had moderate limitations in her abilities to work in coordination with or in proximity to others without being distracted by them, interact appropriately with the general public, and accept constrictions and respond appropriately to criticism from her supervisor. T59-60 The hypothetical also assumed a claimant who could understand, remember, and carry out at least simple instructions and would be best off in a work situation with limited contact with the public and supervisors. T60. Such a claimant, the VE opined, could not do Farringer's past work, but could do other jobs, such as housekeeper, mail clerk, and garment sorter. T60-61. But the VE admitted that a hypothetical claimant with the limitations identified by Naseem would be unable to work, as would a claimant who was limited to light work but would miss more than 3 days a month due to medical conditions. T61-63.

### SEQUENTIAL ANALYSIS AND ALJ FINDINGS

To determine whether a claimant is entitled to disability benefits, the ALJ performs a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(4).

### STEP ONE

At the first step, the claimant has the burden to establish that she has not engaged in substantial gainful activity since her alleged disability onset date. *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006); 20 C.F.R. § 404.1520(a)(4)(i). If the claimant has engaged in substantial gainful activity, the claimant will be found not to be disabled; otherwise, the analysis proceeds to step two. *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(i).

In this case, the ALJ found that Farringer had not engaged in substantial gainful activity since her alleged disability onset date, and that finding is not disputed on appeal. T10.

### STEPS TWO AND THREE

At the second step, the claimant has the burden to prove she has a "medically determinable physical or mental impairment" or combination of impairments that is "severe[,]" 20 C.F.R. § 404.1520(a)(4)(ii), in that it "significantly limits [her] physical or mental ability to perform basic work activities." *Gonzales*, 465 F.3d at 894; *see also Kirby v. Astrue*, 500 F.3d 705, 707–08 (8th Cir. 2007). Next, "at the third step, [if] the claimant shows that [her] impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits." *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(iii). Otherwise, the analysis proceeds.

For mental impairments, at steps two and three of the sequential analysis, the ALJ utilizes a two-part "special technique" to evaluate a claimant's impairments and determine, at step two, whether they are severe, and if so, at step three, whether they meet or are equivalent to a "listed mental disorder." 20 C.F.R. § 404.1520a(a), (d)(1) and (2). The ALJ must first determine whether the claimant has "medically determinable mental impairment(s)." 20 C.F.R. § 404.1520a(b)(1). If any such impairment exists, the ALJ must then rate the degree of "functional limitation" resulting from the impairment. 20 C.F.R. § 404.1520a(b)(2). This assessment is a "complex and highly individualized process that requires [the ALJ] to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation." 20 C.F.R. § 404.1520a(c)(1).

Four "broad functional areas" are used to rate these limitations: "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3). These areas are also referred to as the "paragraph B criteria," which are contained in 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 *et seq*. The first three criteria are rated using a five-point scale of none, mild, moderate, marked,

and extreme. 20 C.F.R. § 404.1520a(c)(4). The fourth criterion, episodes of decompensation, is rated as: none, one or two, three, four or more. *Id*.

After rating the degree of functional limitation resulting from any impairments, the ALJ determines the severity of those impairments (step two). 20 C.F.R. § 404.1520a(d). Generally, if the first three functional areas are rated as "none" or "mild" and the fourth area as "none," the ALJ will conclude that any impairments are not severe, unless the evidence indicates otherwise. 20 C.F.R. § 404.1520a(d)(1). If any impairments are found to be severe at step two, the ALJ proceeds to step three, and compares the medical findings about the impairments and the functional limitation ratings with the criteria listed for each type of mental disorder in 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 *et seq*.

The ALJ found that Farringer had severe impairments: PTSD, fibromyalgia, and gastroparesis. T11. But, the ALJ found, Farringer's impairments did not meet the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appx. 1, § 12.00 *et seq*. T12. The ALJ explained:

> In activities of daily living, the claimant has mild restriction. She reported being able to perform numerous activities despite her mental symptoms, including preparing meals, paying bills, doing chores, and using the computer for shopping, researching, and social networking.
>
> In social functioning, the claimant has moderate difficulties, particularly in the ability to work with others, interact appropriately with the general public, and accept instructions or criticism from supervisors. She reported that she lives with her significant other and spends time with friends and family, she goes grocery shopping and Christmas shopping at Walmart, and she runs errands and occasionally goes bowling.
>
> With regard to concentration, persistence, or pace, the claimant has mild difficulties. Her mental status examinations do not reflect more than mild difficulties with attention, concentration, and memory. She can complete at least simple work and she has been able to independently perform daily tasks, such as volunteer work, online research, and reading.
>
> As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration. There is no evidence of inpatient psychiatric treatment

> or an exacerbation of mental symptoms accompanied by a loss of adaptive functioning for an extended duration.

T12-13.

## RESIDUAL FUNCTIONAL CAPACITY

Before moving to step four, the ALJ must determine the claimant's residual functional capacity (RFC), which is then used at steps four and five. 20 C.F.R. § 404.1520(a)(4). "'Residual functional capacity' is defined as 'the most [a claimant] can still do' despite the 'physical and mental limitations that affect what [the claimant] can do in a work setting' and is assessed based on all 'medically determinable impairments,' including those not found to be 'severe.'" *Gonzales*, 465 F.3d at 894 n.3 (quoting 20 C.F.R. §§ 404.1545 and 416.945).

To determine a claimant's RFC, the ALJ must consider the impact of all the claimant's medically determinable impairments, even those previously found to not be severe, and their related symptoms, including pain. 20 C.F.R. §§ 404.1529(d)(4) and 404.1545(a)(1) and (2). This requires a review of "all the relevant evidence" in the case record. 20 C.F.R. § 404.1545(a). Although the ALJ is responsible for developing the claimant's complete medical history, 20 C.F.R. § 404.1545(a)(3), the claimant bears the burden of proof to demonstrate his or her RFC. *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will consider "statements about what [the claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations," as well as descriptions and observations of the claimant's limitations caused by her impairments, including limitations resulting from symptoms, provided by the claimant or other persons. 20 C.F.R. § 404.1545(a)(3).

The RFC assesses the claimant's ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. § 404.1545(a)(4). The mental requirements of work include, among other things, the ability: to understand, remember, and carry out instructions; to respond appropriately to supervision, coworkers, and work pressures in a work setting; to use judgment in making work-related decisions; and to deal with changes in a routine work setting. 20 C.F.R. §§ 404.1545(c) and 404.1569a(c); SSR 96-8p, 61 Fed. Reg. 34474-01, 34477 (July 2, 1996). An RFC must assess the claimant's ability to meet the mental requirements of work, 20 C.F.R. § 404.1545(a)(4), which includes the ability to respond appropriately to coworkers and work pressures. 20 C.F.R. §§ 404.1545(c) and 404.1569a(c); SSR 96-8p, 61 Fed. Reg. at 34477. The RFC must include all limits on work-

related activities resulting from a claimant's mental impairments. SSR 85-16, 1985 WL 56855, at *2 (1985)

A special procedure governs how the ALJ evaluates a claimant's symptoms. The ALJ first considers whether the claimant suffers from "medically determinable impairment(s) that could reasonably be expected to produce [the claimant's] symptoms." 20 C.F.R. § 404.1529(a) to (c)(1). A medically determinable impairment must be demonstrated by medical signs or laboratory evidence. 20 C.F.R. § 404.1529(b). If this step is satisfied, the ALJ then evaluates the intensity and persistence of the claimant's symptoms to determine how they limit the claimant's ability to work. 20 C.F.R. § 404.1529(c)(1). This again requires the ALJ to review all available evidence, including statements by the claimant, "objective medical evidence,"[3] and "other evidence."[4] 20 C.F.R. § 404.1529(c)(1) to (3).

The ALJ considers the claimant's statements about "the intensity, persistence, and limiting effects of [her] symptoms," and evaluates them "in relation to the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4). Ultimately, symptoms will be determined to diminish the claimant's capacity for basic work activities, and thus impact the claimant's RFC, "to the extent that [the claimant's] alleged functional limitations and restrictions due to symptoms . . . can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id*.; 20 C.F.R. § 404.1529(d)(4). In assessing the credibility of a claimant's subjective testimony regarding his or her alleged symptoms, the ALJ must weigh a number of factors. *See, Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009); 20 C.F.R. § 404.1529(c)(3)(i–vii).[5] When deciding how much weight to afford the opinions of treating sources and other medical opinions regarding a claimant's impairments or symptoms, the ALJ considers a number of factors set forth in 20 C.F.R. § 404.1527.

The ALJ found that Farringer had the RFC to

---

[3] 20 C.F.R. §§ 404.1529(c)(2) and 404.1528(b) and (c).

[4] "Other evidence" includes information provided by the claimant, treating and non-treating sources, and other persons. *See* 20 C.F.R. § 404.1529(a)(1) (and sections referred to therein); *see also* 20 C.F.R. § 404.1529(c)(3).

[5] In assessing a claimant's credibility, the ALJ should consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. *Moore*, 572 F.3d at 524.

> perform light work as defined in [20 C.F.R. § 404.1567(b)][6] except she should avoid even moderate exposure to extreme cold. She has moderate limitation, defined as less than marked but more than mild limitation, in the ability to work in coordination with or proximity to others without being distracted by them, interact appropriately with the general public, and accept instructions and respond appropriately to criticism from supervisors. She can understand, remember, and carry out at least simple instructions and would be better off in a work situation with limited contact with the public and supervisors.

T13. The ALJ found that Farringer's statements concerning the limitations of her symptoms were not credible, stating that the "objective medical evidence is inconsistent with the alleged severity of her impairments." T14-15. The ALJ found that Naseem's opinion was inconsistent with the record. T18. Instead, the ALJ credited Branham's opinion with respect to Farringer's mental condition. T19. The ALJ explained:

> The record shows the level of the claimant's physical and mental complaints are out of proportion to her daily activities and the longitudinal record. She testified that she lives with her significant other and occasionally goes bowling, sees a movie, or gets take-out food or drive-thru; she spends about 3 hours a day on the computer and does 80% of her shopping online, researches, and reads news articles, Facebook, and email; she watches television about 3 hours a day and can concentrate to read a book 30 minutes at a time; she planted flowers and gardened in the summer, cares for 2 dogs and 3 cats, walks the dogs some days, and does 30 minutes of physical therapy stretches a day; she does simple meal prep, pays bills, does some dishes, makes beds, sweeps, drives and runs errands, goes to the gas station and the grocery store some days, and goes Christmas shopping at Walmart; and she talks to her mother and 2 brothers several

---

[6] Light work involves lifting no more than 20 lbs. at a time with frequent lifting or carrying of objects weighing up to 10 lbs. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, the claimant must have the ability to do substantially all of these activities. If someone can do light work, he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

times a week, has the family over for football games occasionally, has 1-2 other friends who visit her every week, and drives 25 minutes one-way to her family's house 1-2 times a month and for holiday gatherings.

Although the claimant testified that she needs some help with her self-care activities, she uses a shower stool because it is hard to bend, and she gets help putting on her shoes and socks, these statements are not very credible in view of the extent of her other reported activities. Similarly, her allegation that she does not like to leave the house erodes her credibility in view of the activities she does. The claimant testified that when she is discharged from the military she wants to go to school and she is considering becoming a lawyer or working for a nonprofit. In January 2011, she began doing volunteer work at a cat rescue on Tuesdays and Saturdays for a total of 6 hours a week cleaning kennels, mopping the floor, and sweeping. This significantly erodes the credibility of her pain complaints.

T19-20.

### STEPS FOUR AND FIVE

At step four, the claimant has the burden to prove that she lacks the RFC to perform her past relevant work. *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can still do her past relevant work, she will be found to be not disabled, otherwise, the analysis proceeds to step five. At step five, the burden shifts to the Commissioner to prove, considering the claimant's RFC, age, education, and work experience, that there are other jobs in the national economy that the claimant can perform. *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(v).

The ALJ found that Farringer was precluded from performing her past relevant work. T20. But, the ALJ found that Farringer could successfully adjust to other work that exists in significant numbers in the national economy. T21. So, the ALJ found that Farringer was not disabled. T21. Farringer appeals.

### STANDARD OF REVIEW

The Court reviews a denial of benefits by the Commissioner to determine whether the denial is supported by substantial evidence on the record as a whole. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011) (citing 42 U.S.C. § 405(g)). Substantial evidence is less than a preponderance but is

enough that a reasonable mind would find it adequate to support the conclusion. *Id*. The Court must consider evidence that both supports and detracts from the ALJ's decision, and will not reverse an administrative decision simply because some evidence may support the opposite conclusion. *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. *Id*.

## DISCUSSION

Farringer argues that the ALJ erred by failing to properly weigh Naseem's opinion, because Naseem was Farringer's treating psychiatrist. The Court agrees.

The opinion of a treating medical source is given more weight because those sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. 20 C.F.R. § 404.1527(c)(2). When the treating physician's opinion is supported by proper medical testing, and is not inconsistent with other substantial evidence in the record, the ALJ must give the opinion controlling weight. *See, id.*; *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012).

Even if the treating source's opinion is not given controlling weight, an ALJ must apply certain factors—the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion. *See* 20 C.F.R. 404.1527(c)(2); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). And the ALJ must *always* give good reasons for the weight given the treating source's opinion. 20 C.F.R. § 404.1527(c)(2); *see also Anderson,* 696 F.3d at 793. Pursuant to that provision, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 61 Fed. Reg. 34490-01, 34492 (July 2, 1996); *Wilson,* 378 F.3d at 544.

There is no dispute that Naseem was a treating source whose opinion was entitled to deference. *See* 20 C.F.R. § 404.1502. The ALJ stated only that Naseem's opinion was "not given great weight because the evidence fails to

support marked limitations or a finding of disability. His opinion is inconsistent with the record as a whole, including his own treatment notes and the claimant's reported activities." T18. The Court has seen that bit of boilerplate before. It glosses over the fact that the ALJ identified nothing particular *in* Naseem's treatment notes that is inconsistent with his opinion. The Court recognizes that it reviews for substance over form: an arguable deficiency in opinion-writing technique does not require the Court to set aside an administrative finding when that deficiency had no bearing on the outcome. *Buckner v. Astrue*, 646 F.3d 549, 559 (8th Cir. 2011). And the Court also recognizes that it is permissible for an ALJ to discount an opinion of a treating source that is inconsistent with the source's clinical treatment notes. *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009). But the Court does not view its standard of review as requiring it to go blindly hunting through a claimant's medical records looking for inconsistencies upon which the ALJ *might* have relied.

Nor does the ALJ's recitation of Farringer's medical history seem to fairly characterize the available records. Any "inconsistencies," to the extent they are apparent, seem to rest on the ALJ's failure to mention aspects of the record that *are* consistent with Naseem's opinion. For example, in reciting Farringer's medical history, the ALJ remarked that "[i]n October 2011, the claimant was doing well with improved mood and continued efforts to improve communication with her family and significant other." T17. And that much is true—but the ALJ did not discuss how, in the same office visit, Farringer "identified that her sleep remains disturbed, and anxiety in public settings while reduced continued to interfere with normal activities." T627. The ALJ continued to note that Farringer "enjoyed her volunteer work with only minor problems with others, and continued to have a more peaceful relationship with her significant other." T17. But Farringer's "minor problems" were produced by "the limited contact she has with others while at work." T619. And the ALJ did not note how Farringer "discussed her anxiety in public settings, with triggers of having people too close to her, feeling trapped or not able to see a way out, beliefs that people are following or watching her, someone may grope her or pickpocket." T619.

The ALJ's primary focus, however, seems to have been on Farringer's self-reported day-to-day activities. The ALJ effectively concluded that Farringer's day-to-day activities demonstrated a capability to perform light work. T20. The Court sees two problems with that conclusion. First, as with Farringer's medical records, the ALJ's recitation of the relevant facts is, while perhaps not wholly inaccurate, at least incomplete. For example—and this is only an example—the ALJ said that Farringer's self-reported activities included "simple meal prep, pays bills, does some dishes, makes beds, sweeps,

drives and runs errands, goes to the gas station and the grocery store some days, and goes Christmas shopping at Walmart." T19. But what Farringer *testified* to was that she did *not* fix meals, although she would sometimes "make like easy mac or something like that." T36. She said she went to the gas station but could not pump gas, "[v]ery rarely" went to the grocery store, and went to Wal-Mart to shop for Christmas "early in the morning or late at night" when the store wasn't busy. T36-37. Simply put, Farringer's actual evidence and testimony does not support the ALJ's characterization. *See Leckenby v. Astrue*, 487 F.3d 626, 634 (8th Cir. 2007).

The Court would find it easier to defer to the ALJ's findings of fact if her decision suggested that the facts had been objectively evaluated. An incomplete description of a claimant's activities is an unpersuasive basis for an ALJ's dismissal of a treating source's opinion. *See Tilley v. Astrue*, 580 F.3d 675, 681 (8th Cir. 2009). The ALJ's recitation of the facts in this case is precisely the sort of "truncated discussion" that the Eighth Circuit has found insufficient to support an ALJ's finding that a claimant's activities are inconsistent with a claim of disability. *See Reed*, 399 F.3d at 922-23.

But more importantly, the Court finds nothing in Farringer's testimony (as opposed to the ALJ's description of that testimony) that is inconsistent with Naseem's opinion regarding Farringer's limitations or ability to work. *See Leckenby*, 487 F.3d at 634. Farringer's ability to engage in some life activities, despite her discomfort, "does not mean she retained the ability to work as of the date last insured." *See Tilley*, 580 F.3d at 681. The Eighth Circuit has, in fact, "oft-expressed skepticism about the probative value of evidence of day-to-day activities," and has found it "necessary from time to time" to remind the Commissioner "'that to find a claimant has the residual functional capacity to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" *Reed*, 399 F.3d at 923-24. The Eighth Circuit has "'repeatedly observed that "the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work."'" *Id.* at 923.

In point of fact, Farringer's self-reported activities are wholly consistent with Naseem's explanation for the etiology of Farringer's limitations.[7] Naseem explained that Farringer was severely socially avoidant, "experienced severe setbacks when exposed to even limited stress[,]" and

---

[7] The Court also notes that some of Farringer's activities were undertaken at the urging of her counselors. It would be somewhat perverse to use Farringer's attempts to overcome her disability as evidence that it did not exist in the first place.

- 16 -

"experiences severe symptoms when challenged." T670-71. Farringer's demonstrated abilities to sweep a floor, load a dishwasher, and make Kraft macaroni and cheese are not inconsistent with Naseem's opinion that Farringer's symptoms would preclude her from functioning in the more stressful context of competitive employment. Stated more generally, Farringer's ability to function in familiar environments does not contradict Naseem's opinion that Farringer could not function well in unfamiliar surroundings. T671. And Farringer also said that even her routine day-to-day tasks suffered from time to time, consistent with Naseem's opinion that Farringer could be expected to miss work more than three times a month due to her limitations. T669.

The Court is aware that an ALJ may discount or even disregard the opinion of a treating source where other medical assessments are supported by better or more thorough medical evidence, or where a treating source renders inconsistent opinions that undermine the credibility of such opinions. *Reed*, 399 F.3d at 921. But Naseem's opinion was the only opinion in the record from a mental health practitioner who had even examined Farringer. The ALJ discounted that opinion in favor of the opinion of a non-treating, non-examining psychologist who relied exclusively on the medical records— including Naseem's records—to arrive at an opinion. *See Shontos v. Barnhart*, 328 F.3d 418, 425 (8th Cir. 2003). The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole upon which to base a denial of benefits. *Id.* at 417. On the record before the Court, the ALJ should have given controlling weight to Naseem's opinion with respect to Farringer's mental condition.

Having reached that conclusion, it is unnecessary for the Court to consider Farringer's other arguments.[8] Naseem's opinion, when given controlling weight, establishes the required level of severity under the criteria contained in 20 C.F.R. Part 404, Subpart P, Appx. 1, §§ 12.06A and 12.06B. Thus, Farringer's impairment meets or equals a presumptively disabling impairment, so the analysis stops at step three of the five-step sequential analysis, and Farringer is entitled to benefits. *See*, *Gonzales*, 465 F.3d at 894; 20 C.F.R. § 404.1520(a)(4)(iii). In the alternative, the evidence is uncontested that given an RFC based on Naseem's opinion of Farringer's limitations, there is not a significant number of jobs in the national economy that Farringer can perform. *See, Gonzales*, 465 F.3d at 894; 20 C.F.R. §

---

[8] The Court notes, in particular, that while Farringer's physical condition was at issue, her mental condition is sufficient to establish disability—so, the Court does not consider whether Farringer's physical symptoms were independently credible or disabling.

404.1520(a)(4)(v). So, even if the sequential analysis proceeds to step five, Farringer is still entitled to benefits. The Court will therefore reverse the Commissioner's decision and remand for an award of benefits. *See Shontos, 328 F.3d at 427.*

## CONCLUSION

The Court has reviewed the administrative record and finds that the ALJ erred in not affording controlling weight to Naseem's opinion. The Court will reverse the Commissioner's decision and remand the case for an award of benefits.

IT IS ORDERED:

1. The Commissioner's decision is reversed.

2. This matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for calculation and award of benefits.

3. A separate judgment will be entered.

Dated this 17th day of September, 2013.

BY THE COURT:

*[signature: John M. Gerrard]*

John M. Gerrard
United States District Judge